UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:14-cv-00141-MOC-DSC

| | | |
|---|---|---|
| **DUKE ENERGY FLORIDA, INC.,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| **WESTINGHOUSE ELECTRIC COMPANY LLC,** | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**THIS MATTER** is before the court on plaintiff's Motion for Summary Judgment (#246) and defendant's Motion for Summary Judgment (#252), which have now both been fully briefed. The court heard oral arguments on September 12, 2016.

The case centers on a $7.6 billion contract (the "EPC Agreement") to design and construct a nuclear power plant in Levy County, Florida. The parties, or their predecessors in interest,[1] signed the contract in December 2008. It is undisputed that plaintiff terminated the contract, and a dispute has arisen about the resulting "Termination Costs" and "Termination Fee" arising from the contract's termination. Duke placed the project in partial suspension in April 2009 and eventually issued a formal termination of the project on January 28, 2014.

Plaintiff has brought claims alleging breach of contract and requesting a refund of payments of approximately $54.1 million in total. In its Complaint (#1), plaintiff Duke Energy Florida ("Duke") also sought declaratory judgment, which has subsequently been abandoned in

---

[1] After a July 2012 merger, Progress Energy merged with Duke Energy and subsequently converted from a corporation to an LLC. Pl. Motion for Summary Judgment 1 (ECF # 246).

1

favor of this active contract litigation. Pl. Resp. to Def. Motion for Summary Judgment 29. Defendant has filed a Counterclaim (#33), alleging that defendant Westinghouse Electric Company, LLC ("Westinghouse") is entitled to recover Termination Costs and plaintiff owes the Termination Fee of $30 million. Defendant also lodged a separate count for a breach of the implied covenant of good faith and fair dealing.

I. **Summary Judgement Standard**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id. The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted). Once this initial burden is met, the burden shifts to the nonmoving party. That party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Instead, that party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). In the end, the question posed by a summary judgment motion is whether the evidence "is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 252.

## II. Analysis

The court has carefully reviewed the extensive filings in this case. The court analyzes the following claims *seriatim*: (a) plaintiff Duke Energy's claim for a refund of payments; (b) defendant Westinghouse's counterclaim for Termination Costs; (c) defendant Westinghouse's counterclaim for the $30 million Termination Fee; and (d) defendant Westinghouse's counterclaim for the breach of the implied covenant of good faith and fair dealing.

### A. Refund of Payments

In its complaint, Duke claims that it is entitled to a refund of two payments: $2,348,660 for reactor vessel internals (RVIs) and $51,778,440 for turbine generators. Pl. Complaint ¶¶ 27, 29-31 (ECF #1). For the reasons the court will discuss, Duke is not entitled to such a refund, but may be entitled to such payments as an offset to the overall Termination Costs described in Part II.B below.

Duke argues that it made two payments to Westinghouse pursuant to the EPC Agreement for work that was not performed. Duke claims it advanced over $54 million toward the costs of RVIs and turbine generators, and subsequently exercised its right under the EPC Agreement to partially suspend work at the site. Pl. First Answer to Interr. No. 7 (ECF #255-9). While the work

was partially suspended, Duke terminated the agreement. As the work was not done, Duke claims it should obtain a refund for payments made.

The court looks to the contractual language when adjudicating this contractual dispute. Here, the plaintiff claims that under Article 22.4(d) of the contract, it is entitled to "rebates, credits or refunds, or any other cost recovery. Pl. First Answer to Interr. No. 7 (ECF #9). The language of Article 22.4(d) is as follows:

> <u>Termination Costs</u>. In the event of termination pursuant to this <u>Section 22.4</u>, Owner [Duke] shall pay contractor [Westinghouse acting as a consortium partner] for its Termination Costs, except that any cancellation fees and charges for termination of any Subcontract shall be paid by Owner at actual cost, without SGA, G&A or Profit. Contractor shall maintain adequate documentation to support its claim for payment. Payment of the amounts specified above shall be Contractors sole and exclusive remedy for termination under this <u>Section 22.4</u>; provided, however the Parties will remain responsible for obligations that accrued prior to such termination or that expressly survive termination of this Agreement, and subject to the limitations set forth in <u>Section 37.2</u>. No Agreement Termination Fees shall be payable by Owner in the event of any termination by either Party under this <u>Section 22.4</u>.

EPC Agreement, ECF # 44-1 (emphasis in original). The court notes that the words rebate, credit, or cost recovery do not appear in the section of the contract's text referred to by the plaintiff. Instead, that language appears in the definition of Deductions elsewhere in the contract, as modified by Amendment Three (#44-7, ¶ 1).

> "Deductions" means the following items **associated with the Contractor's bringing the Work to an orderly cessation or conclusion**, as the case may be, following a suspension of the Work or **termination of this Agreement:** (a) any rebates, credits or refunds (including Tax refunds) obtained, (b) the net proceeds of any sale or transfer of unused Equipment to a third party, or to another use, or to another AP1000 Nuclear Power Plant Project; or (c) any other cost recovery.

Amendment Three to EPC Agreement ¶ 1, ECF # 44-7 (emphasis added).

Whether the work was terminated under Article 22.4 or Article 22.3 is immaterial to the inquiry regarding the alleged rebate. It is undisputed that the work was terminated, triggering the

4

definition of "Deductions" in Amendment Three. Under the contract's language, "Deductions" speak to reductions associated with the work of Westinghouse, not Duke. Regarding these two payments, Westinghouse does not appear to have obtained rebates, credits or refunds, sold the unused equipment, or otherwise recovered its costs.

With regard to the RVIs, Duke next makes an argument not about what is in the contract's text but instead what it does *not* say. The contract, according to Duke, does not make the payments non-refundable. Pl. First Answer to Interr. No. 7 (ECF #255-9). Under this argument, Duke's termination would make the previously paid milestone payments refundable, as the termination would have made the completion of the work milestone impossible. In reply, Westinghouse claims that the milestone payment was not predicated on a condition precedent, and even if it was so predicated, Westinghouse fulfilled its obligation. Def. Reply in Support of its Motion for Summary Judgment 14-15 (ECF #279).

In support of its claim for the RVI payment refund, Duke writes that "Westinghouse admits it never issued the Vendor Purchase Order that it agreed to issue in exchange for the $2,348,661 for the RVIs." Pl. Response to Def. Motion for Summary Judgment 24. Duke cites selectively from Westinghouse's response to its interrogatories. Westinghouse did not engage third party vendors in the RVI, as noted in its answer to interrogatories. Def. Resp. to First Set of Interrogatories 4. That said, the record before the court demonstrates that Manufacturing Work Order with Westinghouse Nuclear Components Manufacturing was placed on November 21, 2008 for RVI components related to the AP1000 plant. Exhibits 5 and 6 in Support of Def. Reply to Motion for Summary Judgment (ECF # 279-5, 279-6). In one letter, dated December 10, 2008, Westinghouse wrote to Garry Miller of Progress Energy, which later merged with Duke, clearly stating that the

work order for RVIs was submitted on November 21, 2008. Exhibit 5 in Support of Def. Reply to Motion for Summary Judgment (ECF # 279-5).

Regarding the RVI payment of $2,348,661, Duke is seeking a "refund it paid to Westinghouse for [RVIs] because Westinghouse failed to do the one thing it was contractually obligated to do to earn that $2.3 million—issue a purchase order to a vendor." Pl. Response to Def. Motion for Summary Judgment 23 (ECF # 264). From the record, Westinghouse, did in fact, issue such a purchase order in November 2008 to an internal vendor. While it is true that the RVIs were not constructed in full, the work was to be done in phases over time with construction occurring at a later phase. Exhibit 6 in Support of Def. Reply to Motion for Summary Judgment (ECF # 279-6).

With regard to the turbine generator, Duke argues that that Westinghouse breached the EPC Agreement as it performed "no work" related to the turbine generators. Pl. Complaint ¶ 31 (ECF # 1). Exhibit F to the EPC Agreement indicates inter alia that the Phase 1 and Phase 2 Milestones for the turbine generators was issuing the purchase order. Westinghouse issued a purchase order to Toshiba America Nuclear Energy Corp. ("TANE") in early 2009. That milestone was completed.

In its Response to the defendant's Motion for Summary Judgment (ECF # 264), Duke raises for the first time an argument based on the implied covenant of good faith. While Duke correctly asserts that this implied covenant is inherent in every valid contract, the argument is not procedurally sound. In this Circuit, new theories cannot be raised in a response to a summary judgment motion that would be tantamount to amending a complaint. See Wahi v. Charleston Area Med. Ctr., 562 F.3d 599, 616–17 (4th Cir.2009); Cloaninger ex rel. Estate of Cloaninger v. McDevitt, 555 F.3d 324, 336 (4th Cir.2009); See also Robinson v. Bowser, No. 1:12CV301, 2013

WL 5655434, at *3 (M.D.N.C. Oct. 16, 2013) ("Fourth Circuit courts have consistently concluded that a party may not use a brief opposing summary judgment to amend a complaint.").

In its Complaint, Duke has alleged that "no work was performed" regarding Turbine Generators. From the record before the court, some non-zero amount of work was completed regarding the turbine generators. At this late stage, Duke now spins a new theory about an alleged breach implied covenant of good faith, in which Westinghouse colluded with its corporate parent to retain the $51 million for the turbine generator. Put simply, Duke cannot change the basis of its claim at the summary judgment stage, without any basis from the original complaint. See Cloaninger, 555 F.3d at 336, Robinson, 2013 WL 5655434, at *3 ("In essence, this means that the Court will not allow Plaintiff to raise a new argument at the summary judgment stage, the basis of which was not evident from the Complaint."). The court finds highly persuasive the reasoning of its colleague elsewhere in the Circuit in Robinson. The Robinson court concluded that allowing a new theory at the summary judgment stage—material enough to be tantamount to amending the complaint—would violate the notice pleading standard and deprive the defendant of fair notice of the claim and the grounds upon which it rests.

If the plaintiff wanted to amend the complaint, it may do so. What the plaintiff may not do is raise new material arguments in opposition to the motion for summary judgment. As our Circuit and several other Circuits have noted, the summary judgment response is not a proper forum to lodge new material arguments. See Barclay White Skanska, Inc. v. Battelle Mem'l Inst., 262 F. App'x 556, 563 (4th Cir. 2008); Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004); Shanahan v. City of Chicago, 82 F.3d 776, 781 (7th Cir. 1996); Tucker v. Union of Needletrades, Indus., & Textile Employees, 407 F.3d 784, 788 (6th Cir.2005); Fisher v. Metro. Life Ins. Co., 895 F.2d 1073, 1078 (5th Cir.1990) ("As the district court correctly noted, this claim

was not raised in Fisher's second amended complaint but, rather, was raised in his response to the defendants' motions for summary judgment and, as such, was not properly before the court."). The court joins its colleagues elsewhere in the Fourth Circuit in adopting this rule of procedure. See Robinson, 2013 WL 5655434, at *3; Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp., 455 F.Supp.2d 399, 436 (D.Md.2006); Miller v. Jack, No. 1:06-cv-64, 2007 WL 2050409 at *4 (N.D.W.Va. July 12, 2007). Accordingly, Duke's good faith reasoning is not properly before the court.

Duke has described the two payments in question as "milestone payments" in its Complaint. Pl. Complaint ¶ 27 (ECF #1). In its Response to the defendant's Motion for Summary Judgment, it noted that the payment for RVIs was an "advance" and the $51.8 million was a "down payment" for the turbines. Pl. Resp. to Def. Motion for Summary Judgment 24-25. Regardless of the classification of these payments, Duke's claim as stated in its Complaint cannot survive summary judgment.

The defendant's motion for summary judgment is <u>granted</u> without prejudice. The plaintiff may file a motion seeking leave to amend the Complaint to more fully argue its good faith and fair dealing allegation. Such determination is, however, without prejudice as to Duke arguing that such payments may be an offset to any termination costs or fees the court determines it owes at trial.

### B. Termination Costs

Westinghouse's counterclaim alleged damages of over $512 million resulting from a breach of the EPC Agreement. Part of these claimed damages are a distinct Termination Fee, discussed below. Whether Duke terminated under Article 22.3 or Article 22.4, elaborated on

8

below, is immaterial to the issue of Termination Costs as both Articles contain provisions requiring Duke to pay Termination Costs.

The largest portion of the counterclaim regards Termination Costs, as defined in the EPC Agreement itself. The contract defines the term "Termination Costs" extensively, including any invoiced or non-invoiced unpaid amounts, Direct Costs not yet paid or reasonably incurred, and general administrative costs. Deductions, as previously defined above, were to be subtracted from the overall Termination Costs.

The parties do not dispute that Duke terminated the contract on January 28, 2014. Further, there is no dispute that upon termination, Duke owes Westinghouse Termination Costs. Pl. Response to Motion for Summary Judgment 4 (ECF #264). The question before the court is how to assess the Termination Costs under the contract and, ultimately, determine the proper amount of costs resulting from the termination.

The court has reviewed the extensive argumentation regarding the quantum of Termination Costs owed by Duke. Duke puts forward a substantial number of arguments, including that it has already paid reasonable Termination Costs, that Westinghouse's Consortium partner did not claim Termination Costs, that Westinghouse allegedly incurred costs beyond the scope of work, and that Westinghouse is estopped from claiming these Termination Costs. This is not an exhaustive list. One thing is certain: the amount of ascertainable Termination Costs are far from a sum certain.

At the summary judgment stage, the court must evaluate the present evidence and assess whether it "is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 252. Here, the court's task is more straightforward than the litany of arguments from the litigants would suggest. Duke agrees that it owes Westinghouse ascertainable Termination Costs

resulting from the termination of the EPC Agreement. Pl. Response to Motion for Summary Judgment 4 (ECF #264). The genuine dispute of material fact is how much is owed, not whether Duke owes the Termination Costs.

The court accepts Duke's own position: Duke owes the Termination Costs. The quantum of such Termination Costs is to be determined at trial.

### C. Termination Fee

Again, the parties do not dispute that Duke terminated the contract on January 28, 2014. What is in dispute is whether Duke's termination triggered Article 22.3 of the EPC Agreement. The EPC Agreement contemplated an Agreement Termination Fee in Article 22.3 of as much as $100,000,000. EPC Agreement ECF #44-1. Article 22.3 allowed Duke to cancel the contract at any time, without cause. If it did so, the termination would be deemed "for convenience" and necessitate a payment from Duke to Westinghouse and its consortium partner.

Duke argues that it did not terminate under Article 22.3 but instead under Article 22.4. Under Article 22.4, termination of the contract was due not to convenience but instead to determinable circumstances. These other contemplated circumstances included: the failure to obtain regulatory approvals; unavailability of insurance coverage; and extended suspension due to the action of the government or *Force Majeure*. Here Duke notes that it did not receive the necessary Combined Operating License ("COL") by January 1, 2014 and invoked Article 22.4(a) to terminate the contract. Pl. Motion for Summary Judgment 28. According to Duke, since it terminated under Article 22.4, not Article 22.3, it should not owe the Termination Fee.

Article 22.4(a) reads in relevant part:

> Failure to Obtain Regulatory Approvals. Either Party may terminate the Agreement upon Notice to the other Party for reasons other than breach of this Agreement by the Party requesting such termination, the Owner [Duke] is **unable**

10

> **to obtain** the COL or any required approval for the Facility at the Site and Nearby Work Areas based on the AP1000 Nuclear Power Plant…by January 1, 2014.

EPC Agreement Article 22.4, (ECF #44-1) (emphasis added). The court notes that Article 22.4 contemplates action on Duke's part. "Obtain" is a verb meaning here either "to bring into one's own possession, to procure" or "to succeed in accomplishing (something) or in having it be accomplished; to attain by effort." Black's Law Dictionary (10th Ed. 2014). In context, the contract contemplated Duke's inability to bring into its possession or attain by effort a license to operate the facility.

Such delving into dictionary definition is more than a semantic exercise. Westinghouse's claim to the Termination Fee rests in part on whether the acquisition of the required COL could require action on behalf of one or more parties to the ECF Agreement. The Court finds the argument compelling.

Amendment Three to the ECF Agreement became effective on March 25, 2010. Duke had issued a partial suspension of work at the site in April 2009. When Amendment Three became effective, the partial suspension had been in place for approximately eleven (11) months. With the partial suspension, it would be reasonable for sophisticated businesses to enter into agreement that re-examines previously-determined dates and deadlines. This is what Amendment Three did. In relevant part, Amendment Three notes:

> All dates or other wording in the Agreement that **may require** either of the Parties to take action under the Agreement during the April 2009 Partial Suspension are hereby suspended…Prior to issuance of the Notice to end the April 2009 Partial Suspension by the Owner, affected dates or wording shall be negotiated between the Parties as a part of a written amendment to the Agreement the impact that the April 2009 Suspension has had upon the timing of associated actions under the Agreement.

Amendment Three to the ECF Agreement ¶ 14 (ECF # 44-7) (emphasis added). The language of the contract clearly notes that dates that "may require" the parties to take action are suspended.

Such is the action of reasonable businesses in the face of uncertainty, to wit, suspend the earlier set of dates and renegotiate based on changed circumstances.

The court is persuaded that the date contemplated in Article 22.4 was suspended by the language of Amendment Three's Paragraph 14. The court soundly rejects Duke's reading of the Amendment Three, in which it noted that "the plain language of paragraph 14 of Amendment Three only suspends dates that 'require either of the Parties to take action under the Agreement.'" Pl. Response to Def. Motion for Summary Judgment 22 (ECF # 264). The Agreement clearly contemplated that Duke would require a license to operate the facility and the court is satisfied that obtaining such a license *may* have required action on Duke's part.

Duke asks the court to consider the parol evidence of contract negotiation to invalidate an express term of Amendment Three to the EPC Agreement. Pl. Response to Def. Motion for Summary Judgment 22. The court declines to do so. The contract language is clear and unambiguous and the court will not read ambiguity into paragraph 14 using parol evidence of contract negotiations.

Based on the language of Amendment Three, the parties suspended many of the dates of the original agreement and intended to re-negotiate them given the extended partial suspension at the site.

Duke claims to have terminated under Section 22.4(a). The court disagrees that January 1, 2014 was the proper date given the suspension of dates in Amendment Three. The court finds that the suspended date in Article 22.4 was left unresolved by the suspension in Amendment Three as the parties intended to renegotiate such dates. The date appearing in Article 22.4(a) was such a suspended date. Yet, it is undisputed that Duke did not obtain a COL for the site. Fortunately, the

court does not need to insert a date for Article 22.4(a), as the parties considered such a circumstance.

Westinghouse argues that another section of Amendment Three would transform a termination prior to resuming work into a termination for convenience, triggering the $30 Termination Fee. Paragraph 6 of Amendment Three reads:

> Any failure by Owner [Duke] to issue such a Notice [to resume] on or before the Notice to End Partial Suspension Date will be treated as a termination by Owner for convenience under Section 22.3.

Amendment Three to ECF Agreement, ¶ 6 (ECF # 44-7). This section uses a defined term that related to the issuance of the COL, "Notice to End Partial Suspension Date." Under Paragraph 2 of Amendment Three, this defined term means a date 365 days after Duke receives a COL for the facility.

Duke claims that Paragraph 6 gave Duke one year from obtaining the COL to lift the partial suspension. According to Duke, the COL had not been issued when it terminated and "the provision could not have been triggered." Pl. Response to Def. Summary Judgment Motion 23 (ECF # 264). The court has a different reading. Duke has not received a COL for this facility, meaning that there was an indefinite future date that fit the definition of Notice to End Partial Suspension Date. Paragraph 6 transforms terminations *on or before* the future date into terminations for convenience. Duke did not issue the Notice to resume before this future date.

The parties could have renegotiated the date in Article 22.4(a) during the extended suspension of work at the site. They did not do so. Duke could have also issued Notice to resume to fulfil its obligations under Paragraph 6 prior to issuing its termination. It did not do so. The court is left with the language of the contract as it exists. Under the contract's language, Duke did not

comply with the formal requirement of Paragraph 6 to issue a Notice prior to termination. As such, the termination was transformed into a termination for convenience.

Such a reading is reinforced when looking at Amendment Three as a whole. As part of the bargained-for exchange, Westinghouse and Duke adapted Section 22.3 to modify the schedule regarding the Termination Fee. This set the Termination Fee at $30,000,000 prior to the earlier of (i) the receipt of Notice to resume work or (ii) the Notice to End the Partial Suspension Date. This a modification is an example of the parties re-negotiating dates in the original Agreement during the protracted suspension at the site.

The court finds that Duke terminated for convenience under Article 22.3, as modified by Amendment Three, and Westinghouse is owed the Termination Fee of $30 million.

**D. Good Faith and Fair Dealing**

Defendant Westinghouse's counterclaim based on the implied covenant of good faith and fair dealing fails as a matter of law. As detailed in the Counterclaim (#33), the claim is based on the allegation that Duke Energy "attempted to avoid, setoff, or reduce its termination-related payment obligations," "advanced position in defense" of its alleged payment obligations to Westinghouse, "refused to agree to reasonable adjustments" to the EPC Agreement, "induced and directed Westinghouse to continue to perform" under the contract even while the site was under a partial suspension, induced Westinghouse to waive contractual rights, and otherwise refused to pay. Def. Answer and Counterclaim ¶ 115 (ECF # 33).

Each contract contains an implicit promise of good faith and fair dealing. Williams v. Craft Dev., LLC, 682 S.E.2d 719, 723 (N.C.Ct.App.2009) ("In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement."). If a claim for breach of this implied

covenant of good faith and fair dealing is "part and parcel" of a another claim for breach of contract, that claim with rise and fall with the other alleged breach. Lord of Shalford v. Shelley's Jewelry, Inc., 127 F.Supp.2d 779, 787 (W.D.N.C. 2000). If a claim for the breach of the implied covenant of good faith rises and falls with the underlying breach of contract claim, it will be dismissed as duplicative and cannot be a freestanding claim for relief. See Rezapour v. Earthlog Equity Group, Inc., No. 5:12-cv-105, 2013 WL 3326026, *4 (W.D.N.C. July 1, 2013). Only a single recovery will be allowed. Murray v. Nationwide Mut. Ins. Co., 472 S.E.2d 358, 368-69 (N.C.Ct.App.1996). Moreover, the implied term of good faith and fair dealing cannot be used to contradict an express term of the contract. Rezapour 2013 WL 3326026, *4; Campbell v. Blount, 210 S.E.2d 513, 515 (N.C.Ct.App.1975).

Defendant Westinghouse claims that the breach of good faith and fair dealing occurred outside the contract, involving extra-contractual behavior intended to force the defendant to compromise its contractual rights. Def. Response to Pl. Motion for Summary Judgement 34 (ECF # 268). The court is unpersuaded by defendant's citation to Cole v. Wells Fargo Bank, N.A., which involved a mortgagor-mortgagee relationship. No. 1:15-cv-39, 2016 WL 737943 (W.D.N.C. Feb. 23, 2016). In *Cole*, the defendant bank inter alia did not respond to the plaintiff's request for a payoff amount until after foreclosure had occurred. Id. at *8.

In this case, Westinghouse alleges that Duke used extra-contractual behavior to freeze it out of future work, including attempting to negotiate a new contract with Westinghouse's consortium partner. Taking such allegations as true, they fall far short of the standard set in *Cole*. Instead of alleging novel damages, this claim duplicates the underlying breach of contract claim sufficiently that the court is satisfied that they would "rise and fall" together. Accordingly, the breach of good faith and fair dealing claim must be dismissed.

**ORDER**

**IT IS, THEREFORE, ORDERED** that plaintiff's Motion for Summary Judgment (#246) is **GRANTED,** in part, and **DENIED,** in part, and that the defendant's Motion for Summary Judgment (#252) is **GRANTED,** in part, and **DENIED,** in part. The plaintiff's claim for a refund of payments made is hereby **DISMISSED**, without prejudice. The defendant's independent counterclaim for a breach of the implied covenant of good faith and fair dealing is also **DISMISSED**, without prejudice. The defendant's counterclaim for Termination Costs may properly proceed to trial to ascertain the relevant costs owed.

Signed: September 29, 2016

Max O. Cogburn Jr
United States District Judge