UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:14-cv-00141-MOC-DSC

| | | |
|---|---|---|
| **DUKE ENERGY FLORIDA, INC.,** | ) | |
| | ) | |
| Plaintiff and Counterclaim Defendant, | ) | |
| | ) | |
| Vs. | ) | MEMORANDUM OF DECISION |
| | ) | |
| **WESTINGHOUSE ELECTRIC COMPANY, LLC,** | ) | |
| | ) | |
| Defendant and Counterclaim Plaintiff. | ) | |

**THIS MATTER** came before the court for a bench trial on Defendant and Counterclaim Plaintiff Westinghouse Electric Company, LLC's (hereinafter "Westinghouse" or "WEC") counterclaim for termination costs.

## FINDINGS AND CONCLUSIONS

### I.      Background

In this action, one of the world's largest designers and builders of nuclear energy plants, Westinghouse, and the nation's largest energy supplier, Duke, have squared off over repayment of some $500 million in initial development costs of a cutting edge "Next Gen+" power plant, a plant that is likely to make *both* titans billions in the coming years.  AS will be seen, Westinghouse was unable to link those development expenses to allowable "Termination Costs" under this contract.

In sum, Duke lawfully exited from a consortium of domestic power companies that backed Westinghouse in seeking approval of its AP1000 Standard Plant design. When Duke thereinafter terminated a separate agreement to build an AP1000 Standard Plant in Florida, Westinghouse attempted to recoup those development costs under the design-build contract at issue here by

-1-

inclusion of Duke's share of development costs in its termination invoice. For the reasons that follow, the court concludes that Westinghouse's inclusion of those development costs in the invoice at issue here -- no matter how equitable that inclusion may seem -- was beyond the terms of the contract. Westinghouse is, however, entitled to recoup from Duke the full termination fee of $30 million plus approximately $4 million in accrued interest, and the court will deny Duke's request for offset of some $51 million, which the court has determined to be a request for recoupment, based on a finding of waiver.

## II. Standards Applicable to Bench Trials

When a case is tried without a jury, Federal Rule of Civil Procedure 52(a)(1) provides that the court "find[s] the facts specially and state[s] its conclusions of law separately." Fed.R.Civ.P. 52(a)(1). The court's duty is to find the facts, weigh the evidence, and choose from among conflicting inferences and conclusions those which the court considers most reasonable. Penn–Texas Corp. v. Morse, 242 F.2d 243, 247 (7th Cir. 1957); Latimer v. Washington Gas Light Co., 2012 WL 2119254 (E.D.Va. 2012).

Sitting as the finder of fact, a trial court may disregard testimony of any witness when satisfied that the witness is not telling the truth, or the testimony is inherently improbable due to inaccuracy, uncertainty, interest, or bias. Columbus–Am. Discovery Grp. v. Atl. Mut. Ins. Co., 56 F.3d 556, 567 (4th Cir.1995). It is the duty of the trial judge sitting without a jury to appraise the testimony and demeanor of witnesses. Burgess v. Farrell Lines, Inc., 335 F.2d 885, 889 (4th Cir.1964). In the end, Rule 52(a) requires that a judge sitting without a jury must do more than announce statements of ultimate fact. United States ex rel. Belcon, Inc. v. Sherman Constr. Co.,

800 F.2d 1321, 1324 (4th Cir. 1986).  The court must support its rulings by referencing the facts on which it relies.  <u>Id</u>.

### III.     Plaintiff's Objection to Denial of Amendment

Prior to trial and after a hearing, this court dismissed Westinghouse's counterclaim for breach of the implied covenant of good faith and fair dealing as well as Plaintiff and Counterclaim Defendant Duke Energy Florida, Inc.'s (hereinafter "Duke" and at times "Progress" when discussing pre-merger events) claim for breach of contract.  Both dismissals were without prejudice.

In the days immediately preceding trial, Duke moved to amend its Complaint to reassert its dismissed claim for Breach of Contract as a claim for Breach of the Implied Covenant of Good Faith and Fair Dealing.  Both the dismissed claim and the proposed claim were based on Duke's 2009 payment of $51,778,440.00 (hereinafter "$51 million")[1] for a Turbine Generator, which was to be built by another subsidiary of Westinghouse's parent corporation, Toshiba. Such motion was denied by the Honorable David S. Cayer, United States Magistrate Judge, for the reasons stated in Westinghouse's opposition brief. Duke then filed an Objection to such determination, which the court took under advisement during the trial.  After trial, Westinghouse filed a response.

Such Objection is overruled as the Magistrate Judge's determination was neither clearly erroneous nor contrary to law; further, having had the benefit of hearing all the evidence and arguments at trial, it appears after *de novo* review that such amendment is futile as no evidence was presented that would have supported a finding by this court that WEC breached the implied covenant. "In every contract there is an implied covenant of good faith and fair dealing that neither

---

[1]      In the original complaint, Duke sought refund of $54.1 million under its breach of contract theory for milestone payments for the Turbine Generator as well as a Reactor Vessel.

party will do anything which injures the right of the other to receive the benefits of the agreement."
Bicycle Transit Authority v. Bell, 314 N.C. 219, 228 (1985) (quoting Brown v. Superior Court, 34 Cal.2d 559, 564 (1949)).  Importantly, "[c]ourts will not apply an implied covenant of good faith and fair dealing to override the express terms of a contract." JTG Equip. & Supply, LLC. v. EBay, Inc., 2015 WL 303589 (N.C.Super.Ct. Jan. 23, 2015) (citing Campbell v. Blount, 24 N.C.App. 368, 371, 210 S.E.2d 513 (1975)).  "The covenant of good faith and fair dealing cannot be used to add a new term to a contract, especially to a commercial contract between two sophisticated commercial parties represented by counsel." D & L Holdings, LLC v. RCG Goldman Co., 734 N.Y.S.2d 25, 31 (N.Y.App.Div. 2001).

Here, Duke's theory is that Westinghouse violated its obligation to structure cash flow in a manner most beneficial to the project owner by ordering a component from a sister corporation under pressure from the parent.  While not binding on this court, the Supreme Court of Wyoming held that

> to establish breach of the implied covenant of good faith and fair dealing, the injured party must demonstrate the other party acted in "bad faith" by violating community standards of decency, fairness or reasonableness, and when the allegation pertains to the performance under a contract, the injured party must demonstrate some type of misconduct. Restatement of Contracts (Second) § 206, comments a. and d.
>
> ***
>
> Here, the district court ruled that R & R did not intentionally overcharge. Universal does not direct us to any authority stating that unintentional mistakes in billing are enough to establish the requisite bad faith or lack of fair dealing. The district court properly ruled R & R did not breach the implied covenant of good faith and fair dealing.

Universal Drilling Co., LLC v. R & R Rig Serv., LLC, 271 P.3d 987, 999 (Wyo. 2012).

While Duke certainly paints a picture of self-dealing, it does not explain why it waited nearly seven years to raise a claim of breach of the implied covenant. Indeed, Westinghouse points to Duke's answers to its interrogatories, which in turn fail to mention any claim of violation of the implied covenant. In any event, the court cannot conclude that in ordering the Turbine Generator in March 2009 that WEC "injure[d] the right of [Duke] to receive the benefits of the agreement." Bicycle Transit Authority, supra. As discussed infra, the greater weight of the evidence persuades the court that Duke was well aware at that time that it would be partially suspending performance of the EPC Agreement. Duke acknowledged that Westinghouse was on the fence about renegotiating the EPC Agreement and ultimately conceded the Milestone payment to assuage Westinghouse in ongoing negotiations over the terms of the Partial Suspension. Such concessions are to be expected between sophisticated commercial parties to a multi-billion dollar contract.

Thus, the court concludes that not only is the magistrate judge's resolution of the motion correct, *de novo* review of the motion based on consideration of all the arguments and evidence presented at trial leads this court to independently conclude that the amendment, if allowed, would have been futile and would have resulted in dismissal at the conclusion of the evidence. The court will, however, consider whether such payment in any manner offsets any termination fees or costs that remain outstanding.

## IV. The Contracts

Duke is the successor to Progress Energy Florida, Inc. ("Progress"), which contracted with Westinghouse on December 31, 2008, to design and build a two-unit nuclear power facility in Levy County Florida (hereinafter the "Levy Project"). This contract is known as the EPC Agreement. (EPC Contract (#44-1)).

In a separate contract in 2007, Progress and two other major domestic power companies (hereinafter the "NuStart companies") combined with Westinghouse to financially support Westinghouse in its application before Nuclear Regulatory Commission (hereinafter "NRC") to obtain a reference COLA for Westinghouse's AP1000 Standard Plant design under the Department of Energy's "Nuclear Power 2010" program. All three domestic power companies had plans to be the first wave of energy companies to operate the Westinghouse AP1000. In a separate contract, the NuStart companies and Westinghouse entered into the "NuStart/Westinghouse Restructured Award Agreement" (hereinafter the "NuStart Agreement"). While this was a substantial undertaking, the NuStart members stood to benefit from their support not just from having in place a reference COLA, but in also receiving royalties from Westinghouse as non-NuStart power companies contracted with Westinghouse to build AP1000 units after the reference COLA was in place.

Soon after entering into the NuStart Agreement in 2007 and the EPC Agreement in 2008, Progress attempted to obtain a Limited Work Authorization ("LWA") from the NRC to do site preparation work at the Levy Project site. In February 2009, however, the NRC denied the request for an LWA, stating that it would only issue the LWA when a COL had been issued. (Pltf. Trial Ex. 37 (Feb. 2009 letter)). Duke presented evidence that such decision meant that it could not do site preparation work needed to support the Levy Project, shifting back the project schedule.

As a result, Progress sent Westinghouse a "Partial Suspension Letter" in April 2009. (Pltf. Trial Ex. 45). Under Section 22 of the EPC Agreement, Progress had the right to partially suspend the Work (as defined by the agreement). Id. In that letter, Progress directed Westinghouse not to proceed with any Work unless it was both: (a) necessary to support Duke's licensing efforts: and

(b) authorized by the Project Director and incorporated as a Change Order. (Trial Tr. at 593:18-596:18; Pltf. Trial Ex. 45). Later that spring, Progress further clarified its partial Suspension Letter by way of a second letter explaining that its intent in the Partial Suspension letter "was to ensure that the Consortium would not continue Work that would be billable to Progress without the specific approval of Progress independent of this Notice of Partial Suspension." (Pltf. Trial Ex. 55). Responsive to those letters, Westinghouse wrote in its June 17, 2009 letter that in addition to a Change Order for incremental work activities (e.g., work not part of the contract scope of work but made necessary by the Partial Suspension) "Progress Energy's written authorization is still required to fund the continuation of the original EPC Firm/Fixed and Target contract scope activities that are necessary to support the COLA . . .." (Pltf. Trial Ex. 57). Duke presented evidence that employees of Progress understood this to mean that the Work necessary to support the COLA was site specific to the Levy plant. (Miller testimony (Trial Tr. at 594:24-595:6). During the partial suspension, the parties negotiated 44 Change Orders totaling $86 million and there is no contention that these billings have gone unpaid. (Stipulation of Fact).

Early on in the period of suspension, Westinghouse asked Progress to make the Investment Recovery Milestone Payments (for Design Finalization and Non-NuStart Royalties). (Trial Tr. at 693:10-694:16; Pltf. Trial Ex. 52). While initially (and apparently still) disagreeing that such payment was due under the terms of the Partial Suspension notice, Progress agreed to make the $65.45 million dollar payment after WEC informed them that they would not agree to extend the period of suspension under the EPC Agreement unless Progress agreed to make all of the Investment Recovery Milestone Payments. Progress relented and on July 9, 2009, agreed to make the payment, with the caveat that such "agreement is not intended to change the suspension of

Work or payments for any other Work under the Partial Suspension Notice." (Pltf. Trial Ex. 61). This payment included $56 million in Design Finalization Milestone Payments and $9.45 million in Non-NuStart Royalties Milestone Payment. It is undisputed that after this $65.45 million dollar payment, Westinghouse did not send Progress or its successor Duke any bill or forecast that any additional money would be owed for design finalization in the event of a termination. (Elnitsky Testimony (Trial Tr. at 698:9-22); Fallon Testimony (Trial Tr. at 835:9-836:2)).

The following year, 2010, the Partial Suspension Letter was superseded by Amendment Three to the EPC Agreement, a provision captioned "Limited Work Scope Amendment." (Pltf. Trial Ex. 114). In paragraph 13 of Amendment Three, Progress agreed to pay Design Finalization Milestone Payments, but it did not authorize further design work. Amendment Three further provided an avenue for WEC to bill Progress for costs incurred during the period of suspension by adding a definition of "Suspension Costs" to the EPC agreement, making Work compensable during the Partial Suspension that had been authorized in writing. Id. at p. 2. Amendment Three permitted WEC to recover only "reasonably incurred Direct Costs that are approved in advance by Owner by issuance of a Change Order." Id.

That same year, Progress also informed WEC that it was contemplating whether to terminate the EPC Agreement or keep it in indefinite suspension until it received the COL for the Levy facility. Progress asked WEC to develop an estimate of Termination Costs if it terminated the EPC Agreement in February 2010. That same month, WEC came back with a termination costs estimate of $246 million, of which approximately $225 million was for Purchase Order Cancellation Costs (for equipment that took manufacturers years to build) and approximately $20.6 in WEC Cancellation Costs (of which Progress/Duke has actually paid $19.7 million, leaving

$862,588 in Home Office and EPC One Time Costs unpaid). (Iller Testimony (Dep. Tr. at 213:16-214:14 and 217:16-218:5); Trial Ex. 719 at p. 32 of 32)). WEC did not include in its 2010 estimate of Termination Costs a *pro rata* share for AP1000 Standard Plant costs for Progress. (Galm Testimony (Dep. Tr. at 241:2-22); Iller Testimony (Dep. Tr. at 340:10-17)). At trial, however, evidence was submitted from WEC's damages expert that showed that WEC believed Progress's *pro rata* share of AP1000 Standard Plant costs at the end of February 2010 was approximately $43 million before markups, and over $65 million with markups. (Def. Trial Ex. 1058). In contemporaneous estimates developed by Progress, it projected EPC Termination Costs of $44 million, consisting of the Termination Fees for the EPC Agreement and a separate fuels contract, and $10 million in other costs. (Pltf. Trial Exs. 664, 729; Elnitsky Testimony (Trial Tr. at 751:10-21).

## V.        Parol Evidence

At trial, the court heard a great deal of evidence concerning back-and-forth negotiations beginning in 2010 where WEC sought to have the definition of Termination Costs broadened to include AP1000 Standard Plant Costs as well as evidence that Progress never agreed to such inclusion.[2]

The court has, however, determined that such evidence amounts to evidence of prior and contemporaneous negotiations and has excluded such as parol evidence inasmuch as the EPC Agreement, as amended, provides the court with precisely what the parties agreed were "Termination Costs," a written provision which was clearly well counseled and intended by all parties to be included as part of a total integration of the agreement. <u>See</u> <u>Smith v. Cent. Soya of</u>

---

[2]        The court has mentioned the evidence not for purposes of substantive consideration, but to provide any reviewing court with a more complete record.

Athens, Inc., 604 F. Supp. 518, 523–24 (E.D.N.C. 1985). Further, the court finds that there is no

ambiguity in the definition of Termination Costs as defined at pages 19 and 20 of the EPC

Agreement.[3] See Root v. Insurance Company, 272 N.C. 580 (1968).

---

3        For convenience, the court has extracted those provisions from the agreement:

"Termination Costs" means the aggregate of the following costs:

        (a)        for Westinghouse, (i) any unpaid amounts (whether invoiced or not) with respect to Payment Milestones that have been completed and/or with respect to Work performed

on a Target Price Basis and a Time and Materials Basis that has been completed, and/or with respect to Progress Payments and other payment obligations that have accrued on or before the date of termination, (ii) plus the other Direct Costs, not yet paid, (including Direct Costs associated with partially complete Payment Milestones) that were reasonably incurred by Westinghouse prior to the date of termination, (iii) plus the Direct Costs reasonably incurred by Westinghouse to demobilize and modify or cancel Equipment or materials orders, and modify or terminate lease agreements, including cancellation fees that Westinghouse cannot reasonably avoid, (iv) plus other reasonably incurred Direct Costs incurred in accordance with Section 22.6, (v) plus other reasonably incurred Direct Costs that are approved in advance by Owner, (vi) minus any Deductions, (vi) plus SGA and Pro Rata Profit on the net amount described in this Subsection (a) to the extent SGA and Profit has not already been included therein; and

        (b)        for Stone & Webster, (i) any unpaid amounts (whether invoiced or not) with respect to Payment Milestones that have been completed and/or with respect to Work performed on a Target Price Basis and Work performed on a Time and Materials Basis that has been completed, and/or with respect to Progress Payments and other payment obligations that have accrued on or before the date of termination, (ii) plus the other Direct Costs (at the rates set forth in Exhibit G) reasonably incurred by Stone & Webster, not yet paid, (including Direct Costs associated with partially completed Payment Milestones) that were incurred by Stone & Webster prior to the date of termination (iii) plus the Direct Costs (at the rates set forth in Exhibit G) reasonably incurred by Stone & Webster to demobilize and cancel or modify Equipment or materials orders, and modify or terminate lease agreements, including cancellation fees that Stone & Webster cannot reasonably avoid, (iv) plus reasonably incurred Direct Costs (at the rates set forth in Exhibit G) in accordance with Section 22.6, (v) plus other reasonably incurred Direct Costs (at the rates set forth in Exhibit G) as approved in advance by Owner as necessary to protect the Work and bring the Work to an orderly conclusion, (vi) minus any Deductions.

Amend. Three at 19-20 (#44-7).

While the court has excluded evidence that has been presented by both sides as to what was meant by Termination Costs, the Parol Evidence Rule does not exclude evidence of post-contractual discussions between the parties in their attempts to estimate Termination Costs.[4] Here, the court has considered evidence concerning the events in 2013 that ultimately ended in formal termination in January 2014.

Duke presented evidence that two events triggered its decision to terminate the EPC Agreement, both occurring in June 2013. First, Duke presented evidence that it had been informed by the NRC that a COL for the Levy Project would not issue until September 2014 at the earliest due to a Westinghouse design error. (Trial Tr. at 779:20-780:6). Second, Duke presented evidence that its decision was also triggered when Florida passed laws concerning regulated energy providers' ability to recover costs from rate payers for nuclear plant development. Duke presented testimony that such law had the potential to create additional delays and costs for Duke. (Trial Tr. at 780:7-781:13).

Anticipating termination of the EPC Agreement, later that same month representatives of Duke travelled in June 2013 to meet outside Pittsburg with representatives of WEC as well as WEC's prime contractor, Stone & Webster. (Trial Tr. at 781:14-25). During those meetings, Duke informed WEC's representatives of the triggering events and -- in what the court considers to be an overture to avoid terminating the agreement – Duke sought to renegotiate the EPC Agreement

---

4       Such negotiations are beyond the reach of the Parol Evidence Rule because they are not part of a transaction "prior to or contemporaneous with" the writing intended to record them. 2 Brandis on North Carolina Evidence § 251. While such evidence could be excluded under other rules of evidence, such as the prohibition on use of evidence of offers and attempts to compromise a disputed claim, F.R.E. 408, such objections were not interposed. The court has, however, limited its consideration of such evidence and has not considered such as evidence that either proves or disproves a disputed claim; rather, the court has limited its consideration of such evidence to determination of whether either side approached determination of termination costs with any bias or prejudice. F.R.E. 408(b).

in a manner consistent with Duke's recently changed ability to recover costs under Florida law and in light of its inability to receive a COL from the NRC until the following year. Consistent with previous negotiations, Duke perceived that WEC was refusing to renegotiate the EPC Agreement (Trial Tr. at 785:1-786:2) and, as discussed *infra*, took the strong statements of WEC's president as an end of discussions rather than an opening salvo.

Perceiving no possibility of again renegotiating the EPC Agreement, Duke determined that it would likely have to terminate the EPC Agreement and asked WEC representatives to estimate Duke's Termination Costs so it could make an informed decision as to termination. What followed was a day-and-a-half discussion between representatives of Duke and WEC. (Trial Tr. at 786:24-797:4; Pltf. Trial Exs. 181, 184). While various costs and outstanding issues were discussed, including unpaid invoices from the prior month and taking responsibility for unwinding Long Lead Equipment (Trial Tr. at 791:21-794:24), the evidence presented indicates that no one mentioned or even suggested at those meetings that Duke would be responsible for a *pro rata* share of AP1000 Standard Plant costs. (Trial Tr. at 791:4-20). A contemporaneous internal financial analysis by WEC revealed that it stood to lose $15 million in operating profit. (Trial Ex. 185). After discussing termination with WEC in late June 2013, Duke informed Westinghouse by letter that it would be terminating the EPC Agreement under § 22.4(a) and formally requesting WEC's Termination Costs. A Duke Press Release issued about the same time likewise indicates Duke's intent to terminate the agreement. (#255-4, at p. 2).

According to the testimony of Duke employee Chris Fallon, WEC's President of the Americas Region, Mark Marano, told him during an August 16, 2013, meeting that termination would harm WEC and that WEC intended to change course and claim substantial termination

costs. The court found Mr. Fallon's testimony credible and noted that Mr. Marano was in the courtroom when such testimony was offered; however, he was never called by defendant to testify in rebuttal. Thus, the court has determined from the greater weight of the evidence that Mr. Marano most likely made such statement. However, the court concludes that such statement does not carry with it the gravitas which Duke suggests. Rather than a declaration that WEC would be cooking the bill, the court concludes that such statement was more akin to posturing and bluster by a representative of a very sophisticated party to a substantial and complex business arrangement. At most, Mr. Marano was stating that if Duke terminated, Westinghouse would be seeking every dollar it believed it was entitled to recover as termination costs under the EPC Agreement, which is a perfectly lawful thing to do.

Clearly, WEC, one of the world's largest suppliers of nuclear power plant designs and equipment, wanted to avoid termination of what was a lucrative agreement with one of the world's largest power companies, even after Duke had notified WEC that it was terminating the agreement.[5] In travelling to Pittsburg, Duke was not there simply to deliver bad news, which could have been done by letter; rather, Duke clearly wanted to renegotiate the deal. Rather than cooling off when hard positions were taken, these parties parted ways rather than stepping back and letting cooler heads prevail. Three days after the meeting between Messrs. Fallon and Marano, WEC sent Duke its August 19, 2013, letter, which was responsive to Duke's July request for an estimate of termination costs. WEC stated it was developing an estimate, but it did not mention that such an

---

5       The court notes throughout the case a clash of corporate cultures, with WEC being headquartered near Pittsburg and Duke being headquartered in Charlotte. As the court has been repeatedly told throughout the case, WEC has taken the position that the invoice at issue here was a starting point that should have been negotiated rather than litigated (Baird Testimony (Trial Tr. at 261:10-14); on the other side, Duke has taken the position that WEC's bill evinced an intent to load up the bill. Clearly, the negotiating cultures of these two corporations are quite different, with overtures by both sides being mistaken for end points.

estimate would include a *pro rata* share of AP1000 Standard Plant design costs. (Trial Tr. at 811:20-813:5). Rather, it was not until September 13, 2013, when WEC sent Duke a letter informing it that it believed Termination Costs would include "at least a proportionate amount of … Direct Costs associated with the [AP1000] Standard Plant." (Pltf. Trial Ex. 205).

## VI. Determination of any Allowable Termination Fee

The first step in determining whether Duke is responsible for items contained in the disputed invoice is to determine the nature of the termination. It is undisputed that under the EPC Agreement as originally written, a termination for Duke's convenience would require Duke to pay a termination fee. A termination for cause, such as an error by Westinghouse that caused delay in obtaining a COL by a date certain, would be without fee or penalty to Duke. As discussed above, Duke believed in 2013 that such cause had then arisen when the NRC informed Duke that the COL would not issue before September 2014 due to what the NRC described as a Westinghouse design error, making the parties miss the January 1, 2014, date for receiving a COL, a date which was included in the EPC Agreement. This court need not decide, however, whether such was in fact an error as the COL date contained in the EPC Agreement was nullified by agreement of the parties in Amendment Three.

While the court has no doubt that the COL issuance date anticipated in the pre-Amendment Three EPC Agreement was missed and that the NRC sent a letter that could support a finding that a design error by Westinghouse contributed to that deadline being missed, the court finds such evidence to be immaterial when the entire agreement as *amended* is read. In particular, paragraph 14 of Amendment Three provides as follows:

14. All dates or other wording in the Agreement that may require either of the Parties to take action under the Agreement during the April 2009 Partial Suspension are hereby suspended, except as provided in Section 12 of this Third Amendment, and except to the extent such action is authorized in writing by Owner's Project Director. Prior to issuance of the Notice to end the April 2009 Partial Suspension by the Owner, affected dates or wording shall be negotiated between the Parties as a part of a written amendment to the Agreement to reflect the impact that the April 2009 Suspension has had upon the timing of associated actions under the Agreement.

EPC Agreement, Amendment Three at ¶ 14 (#44-7 at 8). As indicated in this court's Order on summary judgment, while the termination may have had the earmarks of a termination for cause when viewed under the original terms of the EPC Agreement, Amendment Three changed all that. (#284). Amendment Three clearly anticipated an indefinite suspension of Work, other than Phase I Work related to prosecution of the Levy Plant COLA, as opposed to the Partial Suspension that had been in place since 2009. With the suspension going from "partial" to "indefinite," paragraph 14 made the deadline for receiving a COL immaterial. In light of these changes, Amendment Three provided at paragraph 11 "Termination Fees" for convenience only as no cause (relevant to this inquiry) any longer existed and these fees were keyed to benchmarks which simply asked at what point in the contract is Duke terminating the deal. Specifically, Amendment Three looks to whether the termination came before resumption of the Work (or Notice to End the Partial Suspension) and, thereafter, at what phase in the design and building of the Levy Project such as the first pouring of nuclear concrete. Id. at ¶ 11 (#44-7 at 4). Because Duke noticed termination before resumption of the Work or giving Notice to End Partial Suspension, Duke was obligated to pay a Termination Fee of $30 million and Westinghouse properly included that amount in its Invoice. Duke is clearly responsible for payment of the $30 million Termination Fee and the court's award will so reflect that determination.

**VII.    Determination of any Allowable Termination Costs**

While Duke issued a letter of intent to terminate in the summer of 2013, it was not until January 24, 2014, that Duke formally terminated the EPC Agreement.  (Stipulation of the Parties). By that date, it is undisputed that Stone & Webster had incurred hundreds of millions of dollars in costs for work performed in designing the AP1000 Standard Plant.  Duke has placed into evidence deposition testimony from a former executive of Stone & Webster that neither he nor his company believed that such costs were attributable to the Levy Project or recoverable from Duke under the EPC Agreement.  (Lyash Testimony (Dep. Tr. at 237:11-241:7)).  The court also has before it substantial evidence from which it concludes that most, if not all, of those costs have been paid to Westinghouse and Stone & Webster by not just the consortium members who stayed in the NuStart agreement, but by a Chinese energy company which, while not a domestic energy company, nonetheless became part of the first wave and benefited from NuStart's effort to obtain a reference COLA.  Further, the court notes that there is substantial evidence that taxpayers have also covered a substantial portion of such costs through Department of Energy grants.

With that evidence in mind, on March 27, 2014, WEC sent Duke an invoice for Termination Costs of $512,604,573.00 (hereinafter "512 million").   Of that figure, $482,604,573.00 (hereinafter $482 million) is attributable to Termination Costs (inclusive of escalation and profit) with the remaining $30,000,000 (hereinafter $30 million) being attributable to the negotiated, contractual Termination Fee.  (Pltf. Trial Ex. 634, Attachment A).  As previously discussed, Duke owes WEC the $30 million Termination Fee under the EPC Agreement as Amended. Thus, the court will shift to consideration of whether Duke owes WEC the remaining $482 million.

In their pre-Trial Brief, WEC reduced the $482 million dollar number to approximately $352 million, representing a figure after markups, but before interest. (WEC pre-Trial Brief (#299) at p. 2). Apparently, such reduction reflects (among other reductions) the inclusion of the Chinese energy supplier that is building AP1000 units. This inclusion resulted in division of the NuStart costs between the four energy suppliers that stood to benefit in the first wave of building the AP1000 Standard Plant design, rather than the previous division of costs by the three domestic energy suppliers that were the original members of NuStart.

In considering whether the remaining $352 million is allowable as Termination Costs, the court has been guided by the language of EPC Agreement and the Amendments. In the EPC Agreement, the parties clearly took into consideration the overlap and interplay between the EPC Agreement and the NuStart Agreement: the NuStart agreement had been structured to allow any consortium member to abandon support of the reference COLA without any recourse by the other members, Westinghouse, or Stone & Webster. The EPC Agreement, in turn, contains a provision that is clearly consistent with that escape clause and which on its face does not take that benefit away from Duke. In discussing the Scope of Work under the EPC Agreement and in particular Phase I of that work, the parties agreed in relevant part as follows:

> The parties intend to rely on the results of services Westinghouse is performing under the NuStart/Westinghouse Restructured Award Agreement by and between NuStart and Westinghouse effective April 1, 2007 (the "Restructured Award Agreement") as part of the DOE's Nuclear Power 2010 program (the "NuStart Work") as the basis for certain design, engineering and technical issues with respect to the Standard Plant. Phase I of the Work is intended only to include work that is outside the scope of work Westinghouse is performing for NuStart on a schedule suitable for owner's needs. To the extent NuStart Work is performed pursuant to the Restructured Award Agreement, Owner [Duke] shall not have an independent obligation to pay for the performance of such NuStart Work.

(EPC Agreement § 3.2(c) (#44-1) at 24) (emphasis in the original deleted and emphasis added by the court). Read plainly, such provision provides that Phase I of the Work on the Levy Project was intended to include only work that was outside the scope of work WEC was performing under the NuStart Agreement, to wit, work to obtain approval of a reference COLA for the AP1000 Standard Plant design.

The court determines that billable Phase I Work under the EPC Agreement was, necessarily, site-specific work for the Levy Project. (Pltf. Trial Ex. 65 at pp. 1-2.) Such provision further anticipates what would happen if NuStart Work, necessary for completion of Phase I Work under the EPC Agreement, is accomplished, but unpaid for by the NuStart consortium. The EPC Agreement provides that "[t]o the extent NuStart work is performed pursuant to the [NuStart Agreement], Owner [Duke] shall not have an independent obligation to pay for the performance of such NuStart Work." Id. While Westinghouse states in its Post Trial Brief (#316) that the EPC Agreement speaks for itself, Post Trial Brief at 8, WEC goes on to argue that § 3.2(c) "states that Duke had an obligation to pay for this work for NuStart, albeit an obligation that was not 'independent' of the other NuStart members." Id. The court has read § 3.2(c) most carefully and cannot draw a similar conclusion as it provides just the opposite: "Owner shall not have an independent obligation to pay for the performance of such NuStart Work." Id. at 6. Read in a manner most favorable to Westinghouse, the only event which would trigger Duke's obligation to pay for NuStart work would be if the NuStart work was not performed under the NuStart Agreement. Thus, § 3.2(c) means precisely what it says, Duke has no liability under the EPC Agreement to pay for any Work that is actually performed under the NuStart agreement. The court

does not infer from the term "performed" that such word also meant "paid for." Even if the Court so inferred, Duke presented evidence at trial that the NuStart partners who remained in that deal, along with the Chinese energy producer and the United States Government, fully "paid" Westinghouse for its costs under the NuStart agreement in attaining approval for the AP1000 Standard Plant design.

From the evidence presented, the court concludes that Westinghouse has not satisfied its burden of showing the court that the remaining $352 million is anything other than Duke's *pro rata* share under NuStart agreement. Thus, the $352 million remaining on the Invoice is stricken to the extent Westinghouse contends they are within the definition of Termination Costs.

## VIII.   Determination of Direct Costs

During the period of partial Suspension, Amendment Three allowed WEC to bill and recover from Duke "Direct Costs" for work approved in advance by a "Change Order." (Trial Ex. 114). As the proponent of the Invoice and as the party bearing the burden of proof on the Counterclaim, it was WEC's burden to tie each line item billed for work accomplished during the Partial Suspension to a Change Order issued by Duke. Indeed, not only did Duke present evidence at trial that no such Change Order ever was issued, (see Elnitsky Testimony (Trial Tr. at 698:9-22); Fallon Testimony (Trial Tr. at 835:9-836:21)), WEC's own Answer to the Complaint provided that "Westinghouse admits that neither Westinghouse nor Duke Florida issued a 'Change Order' for the 'Direct Costs' that Westinghouse is seeking in this action and that Westinghouse did not make any formal claim to Duke Energy for payment of these unpaid costs prior to Duke Florida's termination of the EPC Agreement." (WEC Answer ¶ 22 (#33)). The court therefore, concludes, that no aspect of the invoice is payable as a Direct Cost pursuant to any Change Order.

## IX.   Determination of any Costs Necessary to Support the Levy Project COLA

During the period of Partial Suspension, Westinghouse was also authorized under the EPC Agreement to perform Work necessary to support the Levy Project COLA.  Based on the evidence presented, the court cannot find by a preponderance of the evidence that any of $352 million now at issue is in any way tied to Work accomplished by WEC or Stone & Webster in support of the Levy Project COLA.

While the EPC Agreement allowed Westinghouse to seek certain Termination Costs regardless of whether they had previously sent Duke an Invoice for that Work (EPC Agreement at 19, "Termination Costs," subpart (a)), it is clear from testimony concerning billing practices that WEC knew that Duke and its predecessor Progress operated under an accrual method of accounting. Such accounting method requires these publicly traded companies, which are accountable to shareholders *and* ratepayers, to report the expense when it occurs rather than when it is paid. (EPC Agreement §§ 8.8-8.9 (Trial Ex. 478 p. 66 of 527); Trial Exs. 306-08, 310, 317). Further, Duke presented evidence that it was obligated to keep the Florida Public Service Commission apprised of accrued expenses on the Levy Project.  Indeed, the court heard testimony that Duke received monthly and annual statements from WEC for other work for which expense had incurred and which accountants at Duke could at a minimum perform a "sanity check" by comparing the invoice with the previous month's work.  (Dorsett Testimony (Trial Tr. at 913:18-914:8).

Despite such knowledge and what appears to this court to be routine business practice, the evidence is undisputed that before the Termination Invoice, WEC never notified Duke or its predecessors that expenses of enormous proportions were being amassed for performance of Work necessary to support the Levy Project COLA. Indeed, the credible testimony this court heard is that WEC in fact invoiced Duke in accordance with the EPC Agreement for Work performed in support of the Levy Project COLA and after, a "sanity check" was performed on such bills by Duke's accountants, those bills were paid. Based on the course of conduct and dealing, there is no evidence which would support a finding that WEC somehow amassed, by not including on monthly bills, $352 million in un-invoiced costs related to its support of the Levy Project COLA as the clear terms of the agreement required WEC to account for the accruals each month (as well as annually). The court concludes that there are no outstanding Direct Costs payable by Duke.

## X.      Determination of any unpaid Milestone Payments

The definition of Termination Costs entitles Westinghouse to recover "any unpaid amounts (whether invoiced or not) with respect to Payment Milestones that have been completed." (EPC Agreement pp. 19-20 (Trial Ex. 478 at pp. 30-31 of 527)). Read plainly, the agreement would provide that if Duke missed making an agreed-to Payment Milestone, WEC would be able to recover such as a Termination Cost without being obliged to have included such missed payment in a prior invoice or monthly statement of accrued costs. Again, this provision does not aid WEC as the evidence adduced at trial showed that all of the Fixed Price Payment Milestones for Design Finalization in the EPC Agreement were completed inasmuch as WEC met the milestones and Duke Energy made all payments. (Elnitsky Testimony (Trial Tr. at 693:3-7); WEC Answer ¶ 23 (#33)). No Milestone Payments remain outstanding.

**XI.     Determination of any missed Partial Payment Milestones as Direct Costs**

The agreement as to payment of Termination Costs also allowed WEC to include in its Invoice and recover as "Direct Costs" any missed partial Payment Milestones reasonably incurred by Westinghouse prior to the date of Termination. (EPC Agreement at pp. 19-20 (Trial Ex. 478 at pp. 30-31 of 527)).  Based on a reading of the EPC Agreement, the Amendments, and the exhibits thereto, the definition of "Termination Costs" (EPC Agreement at 19-20) requires that such costs be incurred in connection with the "Levy Facility" at the "Levy Site" and within the "Levy Scope of Work."

While WEC does not point to any unpaid partial Milestone Payments, the language of such provision is notable as it lends support to the court's earlier conclusion that the EPC Agreement does not envision Duke paying for costs within the realm of the NuStart Agreement: the evidence presented indicates that Direct Costs are costs necessary for the Levy Facility at the Levy Site and for the Levy Scope of Work and that Direct Costs do not include AP1000 Standard Plant costs. Amendment Three defined the Direct Costs that could be recovered as Suspension Costs during the Partial Suspension, (Trial Ex. 114 at pp. 2-3), which are compensable as Direct Costs only when approved by a Change Order.  Id.

Further, Duke presented evidence that it has paid approximately $401 million to WEC for Direct Costs related to the Levy Project (Pltf. Trial Ex. 1019), and that WEC's own books show no unreimbursed costs on the Levy Project.  (Trial Tr. at 1048:14-1049:16).)  Indeed, the month prior to Duke sending the Termination letter, WEC sent Duke an accrual statement showing that it had accrued $515 million for the Levy Project and that only $113,000 was unpaid. (Pltf. Trial

Ex. 308 at p. 2 of 6.)  There was no evidence presented that such $113,000 was included in the Invoice at issue here or that such particular balance remains unpaid.

## XII.    Conclusion as to Direct Costs

Based on all the evidence presented, the court concludes that the $352 million invoiced is not compensable as any Direct Costs or any unpaid partial Milestone Payment for the Levy Project. Rather, the great weight of the evidence indicates that the $352 million would have been Duke's *pro rata* share of costs for the AP1000 Standard Plant had it remained in the NuStart consortium. By leaving that consortium, as it certainly had the contractual right to do, Duke had no obligation under the NuStart Agreement to pay full freight on bringing the AP1000 Standard Plant reference COLA to fruition.

Indeed, as the court read the NuStart Agreement, the consortium agreed that if any member terminated, the remaining members would carry the expense of supporting Westinghouse in obtaining a reference COLA for AP1000 Standard Plant design. As discussed above, the terms of the EPC Agreement clearly provided that Duke was not responsible for Work accomplished under the NuStart Agreement and no items included in the definition of "Termination Costs" can be read to reverse that provision.  While the court finds that WEC's billing for such costs was made in a good faith reading of the EPC Agreement, that reading was too broad and ultimately not sustainable. Thus, the court concludes that Duke owes nothing of the remaining $352 million.  As per the EPC Agreement, if costs in obtaining the reference COLA for the AP1000 Standard Plant design remain outstanding (which does not appear to be the case based on the evidence presented), WEC would need to look to the partners that remained in the NuStart consortium for payment of what would have been Duke's pro rata share, if it has not done so already. <u>See</u> (Trial Ex. 262 at p.

3)(WEC admits it may recover additional AP1000 Standard Plant costs from remaining consortium members); Baird Testimony (Trial Tr. at 354:4-355:15) (testifying that WEC has received a settlement from consortium member Southern for $705 million which more than covers that member's pro rata share of $308 million); and Young Testimony (Dep. Tr. at 237:17-22, 241:25-242:13) (providing that WEC's Chinese customer paid $147 million in AP1000 design costs).

## XIII. Offset

As promised, the Court has now returned to Duke's request for offset[6] of any amount it now owes ($30 million) based on Westinghouse ordering the construction of a Turbine Generator in 2009, which it allegedly ordered prematurely in March 2009, when it knew by January 2009 that the Levy Project would be delayed. Duke seeks to offset the $30 million by the $51 million Milestone Payment made for such ordered but un-built Turbine Generator.

First, the court has considered prevailing law on offset and recent decisions from North Carolina's Business Court. The North Carolina Business Court recently held, as follows:

> the terms 'offset,' or 'set-off' as it is also known, and 'recoupment' are distinct remedies with distinct legal definitions. Set-off is defined as "[a] defendant's counterdemand against the plaintiff, arising out of a transaction independent of the plaintiff's claim." As a general proposition, a claim for set-off, whether asserted as an affirmative defense or counterclaim, is subject to the applicable statute of limitations. Recoupment is defined as a "[r]eduction of a plaintiff's damages because of a demand by the defendant arising out of the same transaction." In contrast to set-off, a claim for recoupment is not subject to the otherwise applicable limitations period. *Ken-Lu Enters., Inc. v. Neal*, 29 N.C. App. 78, 81, 223 S.E.2d 831, 833 (1976) ("[T]he borrowers' counterclaim is in the nature of setoff, not recoupment. As such, it is subject to the statute of limitations.").

In re S. Eye Ctr.–Pending Matters, 2016 WL 4163928 (N.C.Super.Ct. 2016) (internal citations omitted). As the remedy sought is for a transaction that is *not* independent of Westinghouse's

---

6        The court finds that Duke, as the counterclaim defendant, has sufficiently noticed and preserved this affirmative defense or its recoupment analogue in its pleadings.

counterclaim as all such claims arise under the EPC Agreement, the court deems the request for offset to instead be a request for recoupment.

In considering whether Duke is entitled to the remedy of recoupment, the court has started by considering the obligations of the parties under the EPC Agreement. Section 8.10 of the EPC Agreement requires Westinghouse to "work with Owner [Duke Energy] and use commercially reasonable efforts to optimize Owner's cash flow in order to reduce Owner's financing costs for the Work." Having inked the EPC agreement in December 2008, both sides were well aware of that obligation when in March 2009 Westinghouse ordered the Turbine Generator. As discussed above in the context of denying the Motion to Amend the Complaint, Duke knew at the time of the Milestone Payment that the Turbine Unit may have been ordered prematurely. Thereafter, it asserted its objections, but Duke ultimately relented and made the Milestone Payment in what the court has determined from the evidence was an attempt to assuage Westinghouse in upcoming negotiations necessary to implement a formal Partial Suspension. Indeed, Progress did not formally exercise its right under the EPC Agreement to suspend Westinghouse's performance until Progress issued its Suspension letter on April 30, 2009, which was more than a month after the Turbine Unit was ordered.

Again under North Carolina law, a party may waive the breach of a contractual provision if:

> (1) [t]he waiving party is the innocent, or nonbreaching party, and (2) [t]he breach does not involve total repudiation of the contract so that the nonbreaching party continues to receive some of the bargained-for consideration... and (3) [t]he innocent party is aware of the breach, and (4) [t]he innocent party intentionally waives his right to excuse or repudiate his own performance by continuing to perform or accept the partial performance of the breaching party.

Wheeler v. Wheeler, 299 N.C. 633, 639–640 (1980) (citation omitted). The relinquishment of a right must, however, be intentional and the "intention to waive may be expressed or implied from acts or conduct that naturally leads the other party to believe that the right has been intentionally given up." Phoenix Ltd. P'ship v. Simpson, 201 N.C. App. 493, 500 (2009) (citations omitted).

The court is compelled to conclude by the evidence presented that Duke implicitly waived its right to recoupment of the $51 million Milestone Payment. While initially disagreeing with the invoice, the evidence does not show that the Milestone Payment was made "under protest" or that Duke otherwise reserved its rights to come back and dispute such payment(s). Early in the Partial Suspension, Westinghouse asked Duke Energy to make the milestone payments and Duke disagreed. (Elnitsky Testimony (Trial Tr. at 693:10-694:16, 694:17-696:1); Trial Ex. 52 & 55). Soon after that, Westinghouse Vice President Randy Galm told John Elnitsky that Westinghouse would not agree to amend the EPC Agreement to extend the period of suspension unless Duke agreed to make all of the Investment Recovery Milestone Payments, then totaling $65.45 million, a figure which included the $51 million Milestone Payment for the Turbine Generator. (Elnitsky Testimony). Duke's July 2, 2009 letter agreeing that Duke Energy would make the payments specifically stated that "this agreement is not intended to change the suspension of Work or payments for any other Work under the Partial Suspension Notice." (Pltf. Trial Ex. 61; Elnitsky Testimony (Trial Tr. at 697:15-22).) Nowhere in that letter can the court discern that such payment was made under protest.

Indeed, the reason for not protesting payment is readily apparent as such a reservation of right would have likely caused Westinghouse to withdraw from its cooperation in reaching an agreement concerning Partial Suspension. While the court is not familiar with Westinghouse's

accounting method, such a reservation of right on a $51 million Milestone Payment would have likely moved such amount out from the "credit" side of its ledger, causing it to earmark the payment as a "contingent liability." By not making such payment "under protest" or some equivalent thereof, the court concludes that Duke equitably waived in 2009 its ability to seek recoupment of the $51 million in 2016. The request for offset, deemed to be a request for recoupment, is denied.

## XIV. Interest

While not briefed[7] or argued, the court has considered whether the Judgment should include interest for non-payment of the $30 million Termination Fee. First, under North Carolina law, which governs the agreement, an award of prejudgment interest is appropriate. An award of prejudgment interest in a breach of contract action is governed by Chapter 24–5(a) of the North Carolina General Statutes, which provides, in pertinent part:

> In an action for breach of contract, except an action on a penal bond, the amount awarded on the contract bears interest from the date of breach. The fact finder in an action for breach of contract shall distinguish the principal from the interest in the award, and the judgment shall provide that the principal amount bears interest until the judgment is satisfied. If the parties have agreed in the contract that the contract rate shall apply after judgment, then interest on an award in a contract action shall be at the contract rate after judgment; otherwise it shall be at the legal rate.

---

7    WEC does note its request for interest at footnote 2 in its post-trial Combined Trial Brief and Proposed Findings of Fact (#299 at f.n. 2). In that note, WEC cites to Art. 8.3(d) of the EPC Agreement, and calculates interest beginning to run 32 days after the invoice date and running through October 17, 2016. Based on that calculus, WEC states that it should be awarded $3,954,863.00 in interest. WEC has not, however, shown its math as it has not stated why it allowed 32 days for payment rather than 30, has not discussed how it calculated Prime, and has not provided a daily amount of interest running from October 17 (the first day of trial) through the date of Judgment. At this point, the court believes its calculation of interest at Prime +2 from Invoice plus 30 days through the date of Judgment, to be a more accurate account of interest through the date of Judgment. Acknowledging its unfamiliarity with customary business practices in this industry (which may well add two days for payment of invoices to account for mailing), the parties are welcome to confer and move to amend the Judgment if they can agree on a more precise amount of interest.

Id. Further, "[o]nce breach is established, plaintiffs are entitled to interest from the date of the breach as a matter of law." Cap Care Grp., Inc. v. McDonald, 149 N.C.App. 817, 824 (2002). Reading the EPC Agreement, it appears that payment of the Invoice was due 30 days following receipt (EPC Agreement § 8.1(a)) and that late payments, generally, ran at the Prime Rate plus 2 percentage points. (EPC Agreement §8.3). Inasmuch as Westinghouse submitted its Invoice on March 27, 2014, payment from Duke of the $30 million termination fee was due not later than April 26, 2016.[8] On April 27, 2014, the Prime Rate was 3.25 percent and did not change until December 17, 2015, when it was raised to 3.5 percent. The Prime Rate was changed for a second time on December 15, 2016, to 3.75 percent. Inasmuch as the contract does not provide for compounding interest, the court has applied rules for calculating simple interest. Between April 27, 2014, and December 16, 2015 (598 days), interest accrued on principal at **5.25** percent resulting in interest of $2,580,410.96. Between December 17, 2015, and December 14, 2016 (363 days), interest accrued on principal at **5.5** percent resulting in interest of $1,640,958.90. Finally, between December 15, 2016, and December 22, 2016 (seven days), interest accrued on principal at **5.75** percent resulting in interest of $33,082.19. In total, accrued interest amounts to $4,254,452.05, for a total Judgment of $34,254,452.05, with interest from entry of Judgment running at the federal judgment rate.

---

8       The Court notes that no evidence or arguments were presented on customary grace periods for payments of invoices within this industry, which may be the basis for WEC's reference to "32 days" rather than the contractual 30 days.

**ORDER**

**IT IS, THEREFORE, ORDERED** that Defendant and Counterclaim Plaintiff **WESTINGHOUSE ELECTRIC COMPANY, LLC,** recover of Plaintiff and Counterclaim Defendant **DUKE ENERGY FLORIDA, INC.** on its Counterclaim the sum of **$34,254,452.05**, a sum which includes prejudgment interest, and nothing more. The Complaint and Counterclaims are otherwise **DISMISSED**.

The Clerk of Court is instructed to enter Judgment this day in accordance with this decision, with interest thereafter running at the lawful federal judgment rate.

Signed: December 22, 2016

Max O. Cogburn Jr.
United States District Judge